UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DENNIS CURTIS, on his own behalf and | : | |
| On behalf of all others similarly situated | : | |
| | : | |
| Plaintiff | : | Civ. No. 3:19-CV-01579 (MPS) |
| | : | |
| v. | : | |
| | : | |
| AETNA LIFE INSURANCE COMPANY | : | AUGUST 15, 2023 |
| | : | |
| Defendant. | : | |

**DEFENDANT AETNA LIFE INSURANCE COMPANY'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**Robinson & Cole** LLP
1055 Washington Boulevard
Stamford, CT 06901
Tel.: (203) 462-7500

*Attorneys for Aetna Life Insurance
Company*

*Of Counsel:*
Patrick W. Begos
Theodore J. Tucci
Kevin P. Daly

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................**Error! Bookmark not defined.**

I.     INTRODUCTION ................................................................................ 1

II.    SUMMARY OF ARGUMENT ........................................................... 2

III.   PROCEDURAL HISTORY................................................................. 3

     A.    Dismissal of First Amended Complaint................................... 3

     B.    Second Amended Complaint ................................................... 5

     C.    Partial Dismissal of Second Amended Complaint.................... 5

IV.   UNDISPUTED FACTS ...................................................................... 6

     A.    The Yale Plan's Terms and Conditions ................................... 6

         1.    Short-Term and Habilitation Health Services and Exclusions ................. 6

         2.    Medical Necessity ........................................................ 8

     B.    CPB 325 ................................................................................ 9

     C.    Chronology of Curtis' PT Claims ........................................ 11

         1.    From 2016 to April 2018, Aetna Covered PT Related to a Benign Neoplasm of the Meninges ................................... 11

         2.    From May 2018 to April 2019, Aetna Denied Continued PT to Treat the Benign Neoplasm of the Meninges ......................................... 13

             (a)    Curtis' "Consolidated" Appeal Letters ...................... 14

             (b)    Aetna's Determinations On "Consolidated" Appeals................. 17

         3.    Beginning April 2019, Aetna Covered PT Due to Knee Osteoarthritis .......................................................... 19

V.     STANDARD OF REVIEW ON SUMMARY JUDGMENT ......................................... 20

VI.   LEGAL ARGUMENT........................................................................ 21

     A.    Curtis' PT Claims Were Not Covered Under Rehabilitation/Habilitation Services .............................................................................. 21

         1.    The PT Was Not Covered as Short-Term Rehabilitation ....................... 24

         2.    The PT Was Not Covered As Habilitation Therapy ................................ 26

         3.    Aetna Properly Applied The Yale Plan In Making Its Adverse Determinations ................................................... 27

     B.    Aetna's Consideration of CPB 325 Was Appropriate ......................... 29

     C.    Aetna is Entitled to Summary Judgment on Claims for Reprocessing, Disgorgement, and Injunctive Relief ................................. 31

## TABLE OF CONTENTS
(continued)

**Page**

    1.    Curtis Cannot Assert A Claim For "Reprocessing".................................. 31

    2.    Curtis Cannot Assert A Claim For Disgorgement Of Profits ................. 35

    3.    Curtis Cannot Assert a Claim For Vague And Overbroad Injunctive Relief........................................................................................ 36

VII.    CONCLUSION............................................................................................ 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allison v. UNUM Life Ins. Co.*,
  2005 WL 1457636 (E.D.N.Y. Feb. 11, 2005)........................................................................22

*In re Beacon Assocs. Litig.*,
  818 F. Supp. 2d 697 (S.D.N.Y. 2011)..................................................................................37

*Berceanu v. UMR, Inc.*,
  2023 WL 1927693 (W.D. Wisc. Feb. 10, 2023).....................................................................31

*Biomed Pharmaceuticals, Inc. v. Oxford Health Plans (N.Y.), Inc.*,
  775 F. Supp. 2d 730 (S.D.N.Y. 2011)..................................................................................35

*Brown v. Eli Lilly & Co.*,
  654 F.3d 347 (2d Cir. 2011)..............................................................................................21

*Capstone Logistics Holdings, Inc. v. Navarrete*,
  838 F. App'x 588 (2d Cir. 2020) .......................................................................................38

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).......................................................................................................21

*CIGNA Corp. v. Amara*,
  563 U.S. 421 (2011)..................................................................................................23, 34

*City of New York v. Mickalis Pawn Shop, LLC*,
  645 F.3d 114 (2d Cir. 2011).....................................................................................37, 38, 39

*Clair v. Harris Trust & Sav. Bank*,
  190 F.3d 495 (7th Cir. 1999) ...........................................................................................23

*E.R. v. UnitedHealthcare Ins. Co.*,
  248 F. Supp. 3d 348 (D. Conn. 2017)..................................................................................31

*Frommert v. Conkright*,
  433 F.3d 254 (2d Cir. 2006)..............................................................................................35

*Great-West Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002)..................................................................................................36, 37

*Heimeshoff v. Hartford Life & Acc. Ins. Co.*,
  571 U.S. 99 (2013).........................................................................................................23

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Kee v. New York*,
   12 F.4th 150 (2d Cir. 2021) .............................................................21

*Lord v. Aetna Life Ins. Co.*,
   2014 WL 5307496 (D. Neb. Oct. 16, 2014) .........................................31

*Massachusetts Mut. Life Ins. Co. v. Russell*,
   473 U.S. 134 (1985)...............................................................32

*Meidl v. Aetna, Inc.*,
   2017 WL 1831916 (D. Conn. May 4, 2017).............................................36

*Miles v. Principal Life Ins. Co.*,
   720 F.3d 472 (2d Cir. 2013)..........................................................35

*Miller v. United Welfare Fund*,
   72 F.3d 1066 (2d Cir. 1995)......................................................35, 36

*Mohammed v. Prudential Ins. Co. of Am.*,
   No. 19 C 3258, 2020 WL 4569696 (N.D. Ill. Aug. 7, 2020).................................34

*Montvale Surgical Ctr., LLC v. Aetna Ins. Co.*,
   2013 WL 2285952 (D.N.J. May 22, 2013)...............................................32

*Muller v. First Unum Life Ins. Co.*,
   341 F.3d 119 (2d Cir. 2003)..........................................................22

*Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*,
   2022 WL 743088 (D. Conn. Mar. 11, 2022) .............................................35

*O'Shea v. Littleton*,
   414 U.S. 488 (1974)................................................................34

*of Smith v. Health Care Serv. Corp.*,
   2021 WL 963814 (N.D. Ill. Mar. 15, 2021)............................................34

*Peregrine Myanmar Ltd. v. Segal*,
   89 F.3d 41 (2d Cir.1996)............................................................38

*Petrello v. White*,
   533 F.3d 110 (2d Cir.2008)..........................................................37

*Quality Infusion Care Inc. v. Aetna Life Ins. Co. Inc.*,
   257 F. App'x 735 (5th Cir. 2007) ...................................................31

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Ramsteck v. Aetna Life Ins. Co.*,
  2009 WL 1796999 (E.D.N.Y. June 24, 2009) ..........................................................32

*Richter v. Aetna Life Ins. Co.*,
  2011 WL 13238319 (W.D. Tex. May 10, 2011) ......................................................32

*Rund v. JPMorgan Chase Grp. LTD Plan*,
  2012 WL 1108003 (S.D.N.Y. Mar. 30, 2012) ........................................................22

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
  241 F.3d 232 (2d Cir.2001)......................................................................................37

*Sanchez v. ExxonMobil Med. Plan*,
  2022 WL 17814645 (C.D. Cal. Dec. 5, 2022) ........................................................31

*Selby v. Principal Mut. Life Ins. Co.*,
  197 F.R.D. 48 (S.D.N.Y. 2000) ..............................................................................36

*Shafer v. Zimmerman Transfer, Inc.*,
  70 F.4th 471 (8th Cir. 2023) ....................................................................................24

*Smith v. Health Services of Coshocton*,
  314 F. App'x. 848 (6th Cir. 2009) ..........................................................................30

*Sobhani v. Reliance Std. Life Ins. Co.*,
  626 F. App'x 27 (2d Cir. 2015) ..............................................................................22

*Specialty Surgery of Middletown v. Aetna*,
  2014 WL 2861311 (D.N.J. June 24, 2014) ............................................................32

*Squarepoint Ops LLC v. Sesum*,
  2020 WL 996760 (S.D.N.Y. Mar. 2, 2020) ............................................................38

*Stewart v. Nat'l Educ. Ass'n*,
  404 F. Supp. 2d 122 (D.D.C. 2005), aff'd, 471 F.3d 169 (D.C. Cir. 2006)............23

*Summersgill v. E.I. Dupont de Nemours Co.*,
  2016 WL 94247 (D. Mass. Jan. 6, 2016) ................................................................30

*Thole v. U. S. Bank N.A*,
  140 S. Ct. 1615 (2020)..............................................................................................33

*Tolan v. Cotton*,
  572 U.S. 650 (2014)..................................................................................................21

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*US Airways, Inc. v. McCutchen*,
  569 U.S. 88 (2013)............................................................................................22, 23

*Varity Corp. v. Howe*,
  516 U.S. 489 (1996)..........................................................................................34, 35

*Weiss v. Banner Health*,
  416 F. Supp. 3d 1178 (D. Colo. 2019)..............................................................30, 31

*Wit v. United Behav. Health*,
  58 F.4th 1080 (9th Cir. 2023) ................................................................................33

*Zann Kwan v. Andalex Grp. LLC*,
  737 F.3d 834 (2d Cir. 2013)....................................................................................21

**Statutes**

29 U.S.C. § 1104........................................................................................................23

29 U.S.C. § 1132.....................................................................1, 3, 22, 23, 33, 34, 35, 36

**Other Authorities**

29 C.F.R. § 2560.503-1...........................................................................................9, 30

Fed. R. Civ. P. 8..........................................................................................................5

Fed. R. Civ. P. 65...............................................................................................37, 38, 39

## I.    **INTRODUCTION**

Plaintiff Dennis E. Curtis ("Curtis"), is a retired Yale professor who has received hundreds of physical therapy (PT) sessions since at least 2014, first for a benign neoplasm of the meninges (a non-cancerous tissue mass in the membrane covering the brain) (from 2016 to 2019), and later for knee problems (beginning in 2019). Aetna, as claim administrator of the self-funded health plan established by Yale University ("Yale Plan"), applied the Yale Plan to approve most of Curtis' PT requests, but denied some as well. The Second Amended Complaint ("SAC") identifies denied claims from late April 2018 to April 2019.

The SAC rests on two ERISA theories:

- A First Claim for Relief under 29 U.S.C. § 1132(a)(1)(B) seeking: (a) an order clarifying that his right to PT benefits must be based on the Yale Plan's definition of medical necessity, rather than "inconsistent" provisions elsewhere; and (b) an order enjoining Aetna from denying benefits based on terms in CPB 325 that are not contained in the Yale Plan or are inconsistent with the Yale Plan. (SAC, ¶ 46).

- A Second Claim for Relief under 29 U.S.C. §§ 1132(a)(1)(B) and 1132(a)(3) seeking: (a) an order clarifying that his right to PT benefits must be based on the Yale Plan's definition of medical necessity, rather than "inconsistent" provisions elsewhere; (b) a declaration that Aetna has violated his ERISA rights by using the wrong definition of medical necessity; (c) an order enjoining Aetna from denying benefits based on terms in CPB 325 that are not contained in the Yale Plan or are inconsistent with the Yale Plan; (d) an order requiring Aetna to reprocess his denied PT claims; and (e) disgorgement of "financial benefits" Aetna supposedly obtained from its alleged violations. (SAC, ¶¶ 49, 52).

What Curtis does not ask the Court for is an award of benefits for the PT treatments for which Aetna denied coverage. Instead, he asks the Court to order Aetna to process his (and putative class members') claims again, this time using standards not "inconsistent" with the Yale Plan. However, examination of Curtis' individual claim for benefits demonstrates that he seeks coverage for maintenance care, which the Court has ruled definitively is not a covered benefit. Aetna is entitled to summary judgment on that basis alone. But even if the Court considers Curtis' arguments that Aetna violated ERISA by applying overly narrow medical necessity criteria to his

PT claims and that he is entitled to "reprocessing" (which claims the Court need never reach) those arguments fail as a matter of law.

## II.    <u>SUMMARY OF ARGUMENT</u>

Aetna is entitled to summary judgment on the following grounds:

As a matter of law, Aetna correctly applied the Yale Plan's provisions regarding eligibility, rehabilitation services, exclusions and medical necessity to Curtis' PT claims (both covered and denied). For denied PT claims Aetna correctly determined that Curtis sought PT for maintenance purposes, and that under the Yale Plan's plain terms his request for rehabilitation (or habilitation) services were not eligible for coverage or were excluded. Moreover, because Curtis does not seek an order from this Court awarding him PT benefits, Curtis is prevented from pointing to any material fact issues in dispute (which do not exist in any event) to prevent summary judgment against him. Accordingly, the Court can dispose of this case by simply reaffirming its prior judgment that PT services for maintenance purposes is not an "eligible health service" or is otherwise excluded under the Yale Plan. Medical services that are not eligible for coverage or that are excluded can never be covered under the Yale Plan *regardless* of medical necessity.

Even if the Court wades into the question whether Aetna properly applied the Yale Plan's medical necessity criteria, the Second Amended Complaint still fails as a matter of law. This is because ERISA allows claims administrators to refer to clinical criteria to guide medical necessity determinations. Moreover, a simple comparison of CPB 325 with the Yale Plan's terms shows that CPB 325 is neither inconsistent with nor more restrictive than the Yale Plan.

In addition, the administrative record demonstrates indisputably that Curtis was not entitled to coverage for the denied PT services (which again, he does not ask the Court to consider) because the medical evidence: (a) demonstrates the absence of expected objective and measurable progression (*i.e.*, "significant improvement") being achieved by further PT; and (b) does not

establish why Curtis could not have transitioned safely to a home exercise program to maintain his desired level of functionality.

Finally, summary judgment is required on several claims regardless of CPB 325's provisions because: (i) Curtis' demand for reprocessing of his claim is not a remedy available under either 29 U.S.C. §§ 1132(a)(1)(B) or 1132(a)(3); (ii) Curtis' demand for disgorgement of profits is not relief available in this action under either 29 U.S.C. §§ 1132(a)(1)(B) or 1132(a)(3), and because the payment or denial of claims under the self-funded Yale Plan bears no connection to Aetna "profits"; and (iii) Curtis' demand for injunctive relief demands relief that is impermissibly vague and overbroad.

## III.   PROCEDURAL HISTORY

### A.    Dismissal of First Amended Complaint

Curtis filed his original Complaint in October 2019. (Doc. 1). In response to Aetna's request for a premotion conference for a motion to dismiss (Doc. 17), Curtis filed an Amended Complaint. (Docs. 27, 28). Aetna then moved to dismiss the Amended Complaint (Docs. 33, 34), and the Court granted the motion in March 2021. (Doc. 46). The Court recognized that Curtis' claim for wrongful denial of PT benefits involved a "core theory of liability … that Aetna's medical guidance [CPB 325] adds a condition, allegedly *not* present in [the Yale Plan] that PT services must be expected to improve function[,]" (*Id.* at 14) (emphasis added), and held that Curtis' claim failed as a matter of law because "the factual allegations of the operative complaint, even when all reasonable inferences are drawn in favor of Curtis, show that he is seeking rehabilitative maintenance physical therapy, and that is not a benefit the Yale Plan covers." (*Id.* at 18). Comparing the Amended Complaint's allegations concerning denial of rehabilitative maintenance therapy with the Yale Plan provisions, the Court concluded:

Curtis' allegations are insufficient to state a claim under ERISA when read against the plain terms of the Yale Plan. That is so because, as described in detail above, rehabilitative physical therapy is an eligible health service *only if* it is expected to significantly improve or restore physical functions lost as a result of an acute illness, injury or surgical procedure' ECF No. 33-1 at 36 (emphasis added). But Curtis does not allege that the rehabilitative physical therapy his physicians prescribed for him 'is ([or was]) expected to significantly improve or restore physical functions lost . . .' *Id.* Rather, for the reasons discussed above, Curtis' allegations amount to seeking as a covered benefit what the Yale Plan defines, and expressly excludes coverage for, as '[m]aintenance care.'" *See id.* at 49.

(*Id.* at 23-24) (emphasis and brackets by the Court).[1]

The Court also addressed Curtis' allegation that his PT benefits requests were wrongfully denied because Aetna relied on CPB 325 criteria purportedly narrower than the Yale Plan terms, acknowledging that Curtis identified CPB 325 terms that were "at a minimum, more specific than those provided in the Yale Plan." (*Id.* at 26). In particular, the Court identified one section of the 54-page CPB 325 indicating that a member's physician must have "determined that the member's condition can improve significantly based on physical measures . . . within one month of the date that therapy begins . . ." (*Id.* at 27) (citation omitted). Observing that such language "is not necessarily narrower than that found in the Yale Plan[,]" the Court explained that this assertion did not need to be addressed because "Curtis has not alleged facts demonstrating that he seeks a benefit that [is] otherwise covered by the Yale Plan[.]" (*Id.* at 27, n.13).[2]

---

[1] The Court also stated: "The complaint also makes clear that [Curtis] alleges that he is owed, as a covered benefit, rehabilitative physical therapy treatment regardless of whether, or when, such treatment is expected to lead to any improvement in his condition." (*Id.* at 19).

[2] In commenting on Plaintiff's assertion that CPB 325 imposed a narrower requirement for approval of PT services, the Court took note of the Yale Plan language addressing the durational aspect of the "significant improvement" requirement, such as PT services being "short-term" and "clinically appropriate, in terms of . . duration". (*Id.*).

### B.    Second Amended Complaint

After his Amended Complaint was dismissed for alleging only maintenance therapy claims not covered by the Yale Plan, Curtis moved to alter the judgment and amend the complaint again. (Docs. 48, 49). Curtis sought to overcome the deficiency in the Amended Complaint by explicitly alleging that the requested PT services met the Yale Plan's "significant improvement" requirement. By ruling dated March 15, 2022, the Court granted Curtis' motion. (Doc. 53).

The Court viewed the proposed amendments as specifically targeted to "cure . . . factual deficiencies" in his prior pleading by adding "allegations that [Curtis'] physical therapy services were expected to 'significantly improve' physical functions or 'expected to develop impaired physical functions.'" (Doc. 53 at 6). Drawing all reasonable inferences in Curtis' favor, the Court concluded that the SAC sufficiently alleged that PT was requested for his balance, strength and mobility issues, which services "were expected to 'significantly improve' or 'restore' his physical functions related to balance and mobility that were lost as a result of his neurological condition or surgical procedure." (*Id*. at 18). Accordingly, the proposed new paragraphs 37 and 38 "plausibly allege[] that [Curtis] sought rehabilitative physical therapy services within the meaning of the Yale Plan." (*Id*. at 17).[3]

### C.    Partial Dismissal of Second Amended Complaint

Aetna next moved to dismiss Curtis' class claims concerning forms of rehabilitation therapy for which Curtis never submitted claims for coverage, namely, speech therapy, pulmonary

---

[3] The Court also permitted Curtis to add two paragraphs to assert that he should be entitled to PT benefits coverage because his PT services were prescribed for habilitation therapy purposes as "expected to develop any impaired function". (*Id*. at 14-15, 18). ("Even if the new allegations concerning the types of services that Curtis sought contradict parts of the Amended Complaint, however, Fed. R. Civ. P. 8 allows plaintiffs to 'plead[] inconsistent theories in the alternative'"). (Citation omitted). *See also* Doc. 54 ¶¶ 39-40. Plaintiff's implausible "habilitation therapy" allegations are addressed in Section III.A. of this Memorandum.

rehabilitation therapy, cognitive rehabilitation therapy, occupational therapy, and voice therapy. (Docs. 64, 65). The Court granted that motion on January 4, 2023, holding that Curtis lacked class standing to pursue those claims. (Doc. 74). Thus, Curtis' claims regarding Clinical Policy Bulletins other than CPB 325 have been dismissed.

## IV.    UNDISPUTED FACTS

### A.    The Yale Plan's Terms and Conditions

Curtis is a beneficiary of the Yale Plan that his wife's employer, Yale University, established and/or maintained. (SAC ¶ 11). The Yale Plan is self-funded, and Aetna provides claim administration services. (*Id.* ¶ 13; *see also*, Declaration of Donna L. Lynch ("Lynch Decl."), ¶ 4).

For a health service to be covered under the Yale Plan, it must satisfy at least three criteria: (1) it must be an "eligible health service;" *and* (2) it must not be excluded from coverage; *and* (3) it must be "medically necessary." (Lynch Decl. Ex. 1 at 7) (The Yale Plan "pays for its share of the expense for **eligible health services** only if the … **eligible health service** is **medically necessary**."); (*id. at* 27) ("some of those [eligible] health care services and supplies have exclusions."); (*id.* at 68) (Defining "Covered benefit" as "**Eligible health services** that meet the requirements for coverage under the terms of this plan, including: 1. They are **medically necessary**.") (all bold in original).

### 1.    Short-Term and Habilitation Health Services and Exclusions

Eligible Health Services are "[t]he health care services … listed in the *Eligible health services under your plan* section and not carved out or limited in the *exclusions* section or in the schedule of benefits." (*Id.* at 69) (italics in original). The "*Eligible health services under your plan*" section (*id.* at 10-26), begins with the statement: "Your plan covers many kinds of health care services and supplies[.] … But sometimes those services are not covered at all or are covered

only up to a limit." (*Id.* at 10). Such eligible health services include short-term rehabilitation services and habilitation.

"Short-term rehabilitation services" are services a "physician prescribes" that help "restore or develop skills and functioning for daily living." (*Id*. at 15). "Short-term rehabilitation services have to follow a specific treatment plan." (*Id.*) Short-term rehabilitation services include "Physical therapy, but only if it is expected to significantly improve or restore physical functions lost as a result of an acute illness, injury or surgical procedure." (*Id*. at 16). The description of PT as a *short-term* rehabilitation service intended for *acute* illness, injury or surgery demonstrates that the Yale Plan covers PT for limited durations to achieve restoration or improvement of lost physical function.

"Habilitation services" are "services that help you keep, learn, or improve skills and functioning for daily living (e.g. therapy for a child who isn't walking or talking at the expected age.)" (*Id*. at 16). Like *re*habilitation, habilitation services "have to follow a specific treatment plan, ordered by your physician." (*Id.*).[4]

The Yale Plan also has an exclusions section, including exclusions that apply generally and exclusions pertaining to specific types of care:

> We already told you about the many health care services and supplies that are eligible for coverage under your plan in the *Eligible health services under your plan* section. As we told you there, some of those health care services and supplies have exclusions. For example, **physician** care is an **eligible health service** but **physician** care for **cosmetic surgery** is never covered. This is an exclusion.

---

[4] In granting Aetna's motion to dismiss the Amended Complaint, the Court explained: "The Yale Plan's definitions of rehabilitation and habilitation therapy services are consistent with dictionary definitions of these terms, *see Rehabilitate,* Merriam-Webster Online Dictionary (defining "rehabilitate" to mean "to restore to a former capacity"), https://www.merriam-webster.com/dictionary/rehabilitate (last accessed March 12, 2021); *Habilitate,* Merriam-Webster Online Dictionary (defining "habilitate" to mean "to make fit or capable (as for functioning in society)"), https://www.merriam-webster.com/dictionary/habilitate (last accessed March 12, 2021). (Doc. 46 at 22, n. 11).

(*Id.* at 27) (bold and italics in original).

The Yale Plan specifically excludes PT services prescribed "to treat … chronic conditions."

(*Id.* at 35). Two additional exclusions reinforce the Yale Plan's intent concerning limits on PT

coverage:

**Maintenance care**
- Care made up of services and supplies that maintain, rather than improve, a level of physical or mental function, except for habilitation therapy services.

(*Id.* at 29) (bold in original).

**Strength and performance**
- Services … designed primarily for enhancing your:
  - Strength
  - Physical condition
  - Endurance
  - Physical performance

(*Id.* at 31) (bold in original).

### 2.    Medical Necessity

It is not enough that the requested health service is an Eligible Health Service and not

excluded; it must also be Medically Necessary. (*Id.* at 7). The Yale Plan defines Medical Necessity

as follows:

**Medically necessary/Medical necessity**

Health care services that a provider exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are:

- In accordance with generally accepted standards of medical practice

- Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease

- Not primarily for the convenience of the patient, physician, or other health care provider

- Not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

Generally accepted standards of medical practice means:

- Standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community.

- Consistent with the standards set forth in policy issues involving clinical judgment.

(*Id.* at 72).

### B.    CPB 325

ERISA requires plans to develop "administrative processes and safeguards designed to ensure" that "plan provisions have been applied consistently with respect to similarly situated claimants." 29 C.F.R. § 2560.503-1(b)(5). CPB 325 provides guidance for Aetna's clinical reviewers when assessing the medical necessity of PT claims and is intended to assist those reviewers in evaluating medical necessity consistently across claims. (Lynch Decl. Ex. 2 at 82 ("Clinical Policy Bulletins are developed by Aetna to assist in administering plan benefits and constitute neither offers of coverage nor medical advice. [CPB 325] contains only a partial, general description of plan benefits and does not constitute a contract.").[5]

CPB 325 was developed by considering a broad range of sources, including "[p]eer-reviewed, published medical journals," "available studies on a particular topic," "[e]vidence-based consensus statements," "[e]xpert opinions of health care professionals," and "[g]uidelines from nationally recognized health care organizations" which are cited in the CPB. *See* n.5, *supra*.

CPB 325 is structured as follows: 1) Aetna's clinical policy for PT; 2) notes about limitations and exclusions for PT applicable to plans Aetna administers; 3) a background section

---

[5] Aetna maintains over 950 individual Clinical Policy Bulletins, publicly available on its website, addressing a diverse array of medical services, drugs, equipment, and treatments. *See* https://www.aetna.com/health-care-professionals/clinical-policy-bulletins/medical-clinical-policy-bulletins.html.

explaining medical clinical PT services and criteria for when various PT treatment modalities may satisfy a plan's medical necessity requirement; and 4) an extensive bibliography of medical literature references.

CPB 325 is consistent with the Yale Plan, as demonstrated by a side-by-side comparison of relevant provisions:

| Yale Plan | CPB 325 |
|---|---|
| "Short-term rehabilitation services have to follow a specific treatment plan." Yale Plan, p. 15. | "PT must be provided in accordance with an ongoing, written plan of care that is reviewed with and approved by the treating physician in accordance with applicable state laws and regulations. The PT plan of care should be of such sufficient detail and include appropriate objective and subjective data to demonstrate the medical necessity of the proposed treatment." CPB 325, p.2. |
| "Eligible health services include … Physical therapy, but only if it is expected to significantly improve or restore physical functions lost as a result of an acute illness, injury or surgical procedure." Yale Plan, p. 16.<br><br>. | "Aetna considers physical therapy medically necessary … in order to significantly improve, develop or restore physical functions lost or impaired as a result of a disease, injury or surgical procedure, and the following criteria are met:<br><br>• "The member's participating physician or licensed health care practitioner has determined that the member's condition can improve significantly based on physical measures (e.g., active range of motion (AROM), strength, function or subjective report of pain level) within one month of the date that therapy begins or the therapy services proposed must be necessary for the establishment of a safe and effective maintenance program that will be performed by the member without ongoing skilled therapy services."<br>CPB 325, p. 1. |

| Yale Plan | CPB 325 |
|---|---|
| Medically necessary services must be clinically appropriate "in terms of type, frequency, extent, site and duration". Such services must be "considered effective for the patient's illness, injury or disease" and not "primarily for the convenience of the patient". Yale Plan, p. 72 | The "amount, frequency, and duration" of PT services must be reasonable. The services must be "appropriate and needed for the treatment of a disabling condition and must be palliative in nature". CPB 325, p. 7.<br><br>"The services provided must be of the complexity and nature to require that they are performed by a licensed professional therapist or provided under their direct supervision[.]" *Id.* p. 2<br><br>"Once therapeutic benefit has been achieved, or a home exercise program could be used for further gains, continuing supervised physical therapy is not considered medically necessary." *Id.* p. 3<br><br>"Non-skilled services are certain types of treatment that do not generally require the skills of a qualified physical therapist. Non-skilled services include, but are not limited to … services which maintain function by using routine, repetitive and reinforced procedures after initial teaching of the patient has taken place. These also include most situations where general conditioning, recovery from an acute medical/surgical illness that caused deconditioning or increased general ability to exercise or walk are undertaken." *Id.*, p. 8 |
| The Plan excludes maintenance care, defined as "Care made up of services … that maintain, rather than improve, a level of physical or mental function, except for habilitation therapy services." Yale Plan, p. 29. | "Maintenance care consists of activities that generally are intended to preserve the patient's present level of function and/or prevent regression of that level of function. Maintenance begins when the therapeutic goals of the treatment program are achieved or when no further significant progress is made or reasonably seen as occurring." CPB 325, p. 9. |

### C.    Chronology of Curtis' PT Claims

#### 1.    From 2016 to April 2018, Aetna Covered PT Related to a Benign Neoplasm of the Meninges

Curtis, then 82, sought PT treatment in July 2016 "to treat balance, strength and mobility issues caused by neurological and other conditions." (SAC ¶ 28). Although Aetna "initially

approved coverage, in September 2017," Aetna subsequently began denying coverage on the ground that, pursuant to CPB 325, physical therapy was no longer 'medically necessary.'" (*Id.*)

The administrative record shows that in September 2017, Aetna conducted a clinical evaluation of Curtis' medical records, and summarized its conclusion as follows:

> Reviewing for PT following removal of benign neoplasm of brain lining on 07/06/2016 and treating muscle weakness, walking, and balance. Submitted documentation does support the member & provider reporting new personal record for gait speed with the rolling walker and continued progress with therapy. As this is supported by the functional progression with the functional goals. Member has made an additional 10% increase with improving balance and prevent falls/successfully avoiding falls since the last review. However, there's no additional measurable gains being given to support allowing beyond the last DOS. With the member having functional progress towards meeting functional goals and improved gait, will recommend to allow PT through the last DOS [August 31, 2017] and then deny going forward as documentation doesn't support allowing beyond.

(Lynch Decl. Ex. 4 at 1).

By letter of September 18, 2017, Aetna confirmed that its "coverage decision was based upon the covered benefits/determination of Medical Necessity as described in your plan documents." (Lynch Decl. Ex. 5 at 2). Applying the Yale Plan, Aetna concluded that "[t]he available documentation does not support improvements with measurable gains. Therefore, the ongoing, supervised physical therapy to treat muscle weakness, walking, and balance is not considered medically necessary." (*Id.*)

Curtis successfully appealed this initial denial, resulting in Aetna's "payment of benefits for Mr. Curtis' physical therapy through April 18, 2018[.]" (SAC ¶ 28). Specifically, Curtis submitted an April 23, 2018 letter, which included "a new report from the referring doctor, Joseph Schindler." (Lynch Decl. Ex. 6 at 1). Curtis stated that Dr. Schindler's April 11, 2018 evaluation "observed noticeable improvement[.]" Dr. Schindler's letter stated:

> In my clinical judgment, physical therapy has benefited Professor Curtis. I have seen the impact of the physical therapy in my November assessment of Professor Curtis. Physical therapy has provided benefit for his continued impairments from the recurrent

> strokes, the most recent in relation to the meningioma resection. Physical therapy treatment is an indicated long-term treatment given his recurrent strokes and orthopedic issues to maintain his current level of functioning.

(Lynch Decl. Ex. 7 at 1).

Considering this additional appeal information, Aetna approved Curtis' request for PT benefits from December 24, 2017 through April 23, 2018. Aetna explained the reasons for its decision:

> Based on our review of the above information, we are reversing our previous decision and will now allow physical therapy services on dates of service December 24, 2017 to April 23, 2018. … A review of the documentation provided demonstrates a regression in function requiring additional physical therapy. As such, payment will be provided for physical therapy services provided on dates of service December 24, 2017 to April 23, 2018.

(Lynch Decl. Ex. 8 at 1-2).

> **2.    From May 2018 to April 2019, Aetna Denied Continued PT to Treat the Benign Neoplasm of the Meninges**

Curtis received PT from May 3, 2018 through April 15, 2019; the PT records show that Dr. Schindler continued as his referring physician, and that the "treatment diagnosis" for which the PT was being provided was "Benign neoplasm of meninges, unspecified." (Lynch Decl. Ex. 3 at AR04054-04159, p. 134-234 of 273).[6]

Curtis claimed to need continuous PT through the Spring of 2019, but the administrative record reveals that Curtis self-directed treatment for his convenience. Curtis skipped PT for almost two months in the summer of 2018, telling his therapist that he "will be out of the country again for a while to London, Tel Aviv and Berlin." (Lynch Decl. Ex. 3 at AR04058, p. 138 of 273). On returning from his travel, Curtis reported that stairs and rising from sitting to standing had become

---

[6] PT records from 2016 to 2020 are submitted with the Lynch Declaration.

difficult, and that "I cannot put luggage in the overhead compartments on airplanes. I have always been able to do this until just this trip. I would like exercises to be able to address all of these new limitations." (*Id.* at AR04068, p. 148 of 273). His PT provider subsequently noted that "Travel abroad has interfered with his normal exercise sessions." (*Id.* at AR04078, p. 158 of 273). There is no medical evidence in the administrative record supporting a conclusion that these "new limitations" after Curtis' two-month 2018 trip were causally connected to the deficits caused by the 2016 "benign neoplasm" diagnosis or that his functional status could not have been maintained through home exercise.

Based on the medical evidence submitted, Aetna upheld its determinations on administrative appeal, explaining:

> [A] review of the submitted documentation failed to demonstrate *a clinical presentation that would require medically necessary skilled physical therapy* with sufficient and significant objective and measurable functional restoration and progression being achieved within the period of denial[,] or rationale provided as to why a safe transition to a home exercise program could not have been implemented for further functional progression[,] and therefore, medical necessity of the skilled physical therapy was not established.

(Lynch Decl. Ex. 9 at 2, 4, 6) (emphasis added).

### (a)    Curtis' "Consolidated" Appeal Letters

In response to Aetna's determinations, Curtis pursued a strategy of filing appeals and re-appeals, claiming coverage for PT treatment spanning multiple weeks or months, as illustrated below:

*October 25, 2018 Appeal Letter*

On October 25, 2018, Curtis appealed "the ongoing failure of Aetna to cover the physical therapy prescribed in April of 2018[.]" (Lynch Decl. Ex. 10 at 1). He began to "consolidate[e]" his appeals because of "the burdens and waste of paperwork[.]" (*Id.*) Curtis continued to rely on Dr. Schindler's March 2018 rationale that PT was necessary to recover from the effects of the benign

neoplasm, but Curtis' own words show that the requested PT was actually for maintenance purposes: he claim that he is "working hard *to retain* mobility." (*Id.*) (emphasis added).

This October 2018 appeal included a progress note from an April 11, 2018 examination by Reshma Narula, M.D., a "neurovascular fellow." Dr. Narula noted: "Since his last visit [May 2017] overall he reports that his condition has improved. They continue to work with physical therapy, however, he continues to report weakness in his legs with walking short distances in addition to fatigue." (*Id.* at 3). On examination, she reported that Curtis' gait was "[w]ide [based] but steady walking with cane." (*Id.*) For her "Assessment and Plan," Dr. Narula noted that Curtis "continues to report deconditioning, fatigue, and trouble with completing tasks. We would recommend ongoing physical therapy for this." (*Id.* at 4) The progress note included an addendum from Dr Schindler, admitting that Curtis "***is beyond the traditional acute and subacute phases of his stroke***," but asserting that PT should continue in order "to promote, **maintain**, and restore physical and physiological well-being of our patient." (*Id.*) (emphasis added).

*November 6, 2018 Appeal Letter*

A few weeks later, Curtis appealed again, stating, "we have now seen Dr. Schindler again (on October 31, 2018) and then on November 1-2 2018, Professor Curtis was hospitalized, through an Emergency Department admission, because of concerns that required a 'stroke alert' workup." (Lynch Decl. Ex. 11 at 1). His self-report stated: "Dr. Schindler identified concerns about declining balance, mobility, and movement and told us that [it] was essential to continue working [with PT] to mitigate those issues. In short, there is no basis for Aetna to have refused, and to continue to refuse coverage." (*Id.*) No medical records accompanied this letter.

15

*November 29, 2018 Appeal Letter*

At the end of November, Curtis wrote to Aetna again. He reported recent examinations by Dr. Schindler and "another neurological specialist, Dr. Salardini." (Lynch Decl. Ex. 12 at 1). According to Curtis, "[b]oth were totally clear that it is imperative for Professor Curtis to have had and to continue to have intensive physical therapy in the hopes of ***continuing to be independent and to maintain mobility***." (*Id.*) (emphasis added). Curtis' assertion was not confirmed by any medical records from Dr. Schindler or Dr. Salardini, prescribing PT or detailing a treatment plan to rectify physical deficits. Instead, Curtis submitted an advocacy letter from Dr. Schindler, asserting that Curtis "had not plateaued from modalities offered by physical therapy[,]" and concluding: "Given the complexity of his recent medical and surgical history, he deserves optimal medical and rehabilitative care to support his recovery goals. I encourage you to reconsider coverage for the claims that have allowed Mr. Curtis to work toward a better quality of life." (*Id.* at 3). Dr. Schindler's request for benefits on behalf of his patient was simply a retrospective review of Curtis' condition prior to April 4, 2018. Dr. Schindler provided no contemporaneous medical records concerning the period for which PT benefits was requested (May 2018 to November 2018), and no written plan of care describing functional improvement goals expected from further PT.

*April 22, 2019 Appeal Letter*

In April 2019, Curtis wrote to Aetna again concerning Aetna's decision to not approve PT services from April 2018 forward. Curtis argued that he should receive ongoing PT because he was 85 years old, had recovered from strokes and brain surgery and injured his knee twenty years ago. (Lynch Decl. Ex. 13 at 1). The letter referenced unnamed providers (orthopedists, a rheumatologist, a neurologist) but included no treatment notes or proposed care plan. (*Id.*) The April 2019 appeal made clear that Curtis' benefits request bore no relationship to a need for

medically necessary PT to achieve measurable functional restoration and progression. Curtis again confirmed that he desired continued PT because it "is the only way that [I] *can seek to maintain* upper body strength, to improve [my] ability to walk, to retain flexibility, and to regain balance so [I] can lift [myself] out of a chair or of bed and support [myself] on the walker." (*Id*. at 2) (emphasis added).

Throughout this period, Curtis continued to visit his physical therapist, and the PT notes continued to identify Dr. Schindler, the neurologist, as the prescribing doctor, and benign neoplasm of meninges as the treatment diagnosis that supported the need for PT rehabilitation. But Curtis' reports showed his desire for PT was unrelated to deficits caused by illness or injury: "My legs feel exhausted today because I was on my feet more than usual yesterday. I have started to take some art classes that have me on my feet for more than I'm used to." (Lynch Decl. Ex. 3 at AR04117, p. 194 of 273).

#### (b)    *Aetna's Determinations On "Consolidated" Appeals*

Aetna evaluated all of Curtis' appeals and letters (not all of which are detailed here), and upheld its determinations that the PT visits from May 2018 to April 2019 were not covered under the Yale Plan. For example:

For denied PT claims from May 3, 2018 to September 14, 2018, Aetna explained that "[t]he documentation did not reveal objective and measurable progression being achieved during the period of denial. A safe transition to a home exercise program could have been implemented for continued functional progress." (Lynch Decl. Ex. 14 at 2). Aetna upheld its determination regarding this period from PT a second time. (Lynch Decl. Ex. 15 at 1). Aetna's appeal review included evaluations from a nurse, a physician, and a physical therapist. (*Id*. at 3). Aetna's decision was based on the coverage, exclusion, and medical necessity provisions of the Yale Plan and was consistent with CPB 325 guidelines:

In this case, review of the submitted medical records reveals therapeutic benefit appears to have been achieved. Supervised neuromuscular re-education for complications of meningioma (2016) is neither regressing nor improving during the billed date(s) of service (DOS). The documentation does not indicate why discharge to a home exercise program could not have been used for further gains prior to this DOS.

In addition, our member's benefits allow short term restorative therapy for non-chronic conditions and acute injuries or illness and do not allow long term rehabilitation for symptom maintenance of chronic conditions.

(*Id.* at 2).

Aetna also upheld its PT benefits denial from September 20, 2018 to October 29, 2018. (Lynch Decl. Ex. 16 at 1). Once again, Aetna relied on medical input from a physician and a physical therapist, which supported Aetna's conclusion that available treatment records did not demonstrate "measurable improvement to support the medical necessity of skilled physical therapy or demonstrate why you could not transition to a home program." (*Id.* at 3).

Aetna notified Curtis that it upheld its coverage denial from October 31, 2018 to February 27, 2019. (Lynch Decl. Ex. 17 at 1). The letter stated that the appeal was reviewed by a doctor, and that: "[t]he documentation did not reveal objective and measurable progression being achieved during the period of denial. A safe transition to a home exercise program could have been implemented for continued functional progress." (*Id.* at 2).

Aetna notified Curtis that it was upholding its decision to deny coverage from October 29, 2018 to April 1, 2019. (Lynch Decl. Ex. 18 at 1). With the benefit of a review by a physical therapist, Aetna explained: "A review of the submitted documentation failed to demonstrate a clinical presentation that would require medically necessary skilled physical therapy with sufficient and significant objective and measurable functional restoration and progression being achieved within the period of denial or rationale provided as to why a safe transition to a home

exercise program could not have been implemented for further functional progression and therefore, medical necessity of the skilled physical therapy was not established." (*Id.* at 2).

### 3.    Beginning April 2019, Aetna Covered PT Due to Knee Osteoarthritis

In April 2019, Aetna approved Curtis' benefits request for evaluation of his left knee, including bilateral x-rays, MRIs and evaluation by Dr. Charles DiSabatino. (Lynch Decl. Ex. 20 at 1). The left knee MRI showed "Tricompartmental osteoarthrosis, most severe of the patellofemoral compartment, has mildly progressed since the prior MRI from 2013. Complex medial meniscal tear as described above. Chronic injury of the anterior cruciate ligament. Status post quadricep tendon repair with similar appearance of the quadriceps tendon since the prior MRI." (Lynch Decl. Ex. 21 at 5). After this evaluation, the focus of Curtis' requests for rehabilitation PT services shifted dramatically.

On April 22, 2019, his physical therapist completed an "Initial Evaluation" based on a referral from Dr. DiSabatino, with a "treatment diagnoses" of "ICD 10: M17.12: Unilateral primary osteoarthritis, left knee, M23.232: Derangement of other medial meniscus due to old tear or injury, left knee, S83.512S: Sprain of anterior cruciate ligament of left knee, sequela, 57 6.111D: Strain of right quadriceps muscle, fascia and tendon, subsequent encounter." (Lynch Decl. Ex. 3 at AR04160, p. 235 of 273).

Following this Initial Evaluation based on Dr. DiSabatino's new PT referral, Aetna approved PT treatment for functional impairment related to his knee treatment diagnosis under the Yale Plan. (Lynch Decl. Ex. 22). Curtis' PT records throughout the rest of 2019 and into 2020 stated that PT was ordered by Dr. DiSabatino for treatment of Curtis' knee problems. Aetna approved those PT claims.

The administrative record regarding Curtis' PT claims beginning April 2019 do not support Curtis' allegation that "[t]he medical need and purpose of the physical therapy ordered for Mr.

Curtis by his treating physicians prior to April 2018 did not abate or change in April 2018, and from April 2018 to date[.]" (SAC ¶ 29; *see also id.* ¶ 34) ("the medical necessity, purpose and likely effect of the physical therapy ordered for Mr. Curtis by his treating physicians after November 17, 2019 is identical to the medical necessity, purpose and likely effect of the physical therapy ordered for Mr. Curtis from April 2018 through November 17, 2019[.]"). As shown by PT records, the medical necessity, purpose and effect of the PT was different after April 12, 2019 into 2020, than it had been from May 2018 to April 2019. In summary:

| Time Period | Diagnosis Allegedly Supporting PT | Coverage Decision |
|---|---|---|
| 2016-April 2018 (Lynch Decl. Ex. 3 at AR02095-03149 p. 1-133 of 273) | Benign Neoplasm of the Meninges | Rehabilitation Covered |
| May 2018-April 2019 (Lynch Decl. Ex. 3 at AR04054-04159 p. 134-234 of 273) | Benign Neoplasm of the Meninges | Maintenance Care Excluded/Not Covered |
| April 2019-2020 (Lynch Decl. Ex. 3 at AR04160-04104 p. 235-273 of 273) | Knee Osteoarthritis | Rehabilitation Covered |

## V.     STANDARD OF REVIEW ON SUMMARY JUDGMENT

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (quotation marks omitted). In deciding a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. New York*, 12 F.4th 150, 158 (2d Cir. 2021). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*,

737 F.3d 834, 843 (2d Cir. 2013) (quotation marks omitted). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

Because Curtis does not seek an award of benefits, a discussion of the process to be undertaken in conducting a *de novo* review is not relevant to this motion. However, it is relevant that "the presumption is that judicial review is limited to the record in front of the claims administrator unless the district court finds good cause to consider additional evidence." *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 125 (2d Cir. 2003) (quotation marks omitted). This is because "trial de novo on new evidence would be inconsistent with reviewing the administrator's decision about whether to grant the benefit." *Id.* (quotation marks omitted). Here, Curtis seeks reprocessing of his claims pursuant to 29 U.S.C. § 1132(a)(1)(B), which governs ERISA benefits claims, and this evidence supporting reprocessing must exist in the administrative record.[7]

## VI.    LEGAL ARGUMENT

### A.    Curtis' PT Claims Were Not Covered Under Rehabilitation/Habilitation Services

It is a bedrock ERISA principle that a plan participant or beneficiary cannot recover benefits that the plan does not provide: "The statutory scheme, we have often noted, is built around

---

[7] "An administrative record properly consists of the evidence before the entity that decided the claim when that decision was rendered." *Allison v. UNUM Life Ins. Co.*, 2005 WL 1457636, at *9 (E.D.N.Y. Feb. 11, 2005)); *Rund v. JPMorgan Chase Grp. LTD Plan*, 2012 WL 1108003, at *1 (S.D.N.Y. Mar. 30, 2012) ("The administrative record consists of the documents before the claims administrator when the decision regarding benefits was made"). *See also Sobhani v. Reliance Std. Life Ins. Co.*, 626 F. App'x 27, 28 (2d Cir. 2015) ("in rendering its decision, the District Court drew from and relied on a 508-page file containing documents pertaining to Sobhani's claim. … The Court described this file as '[t]he Administrative Record,' and by all appearances that is what it is").

reliance on the face of written plan documents. . . . The plan, in short, is at the center of ERISA." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 100–01 (2013) (internal citations omitted).

ERISA's statutory scheme is explicit. 29 U.S.C. § 1132(a)(1)(B) authorizes a participant or beneficiary of an ERISA plan to sue "to recover benefits due to him *under the terms of his plan*, to enforce his rights *under the terms of the plan*, or to clarify his rights to future benefits *under the terms of the plan*" (emphasis added). The Supreme Court has explained the limited relief authorized by this section: "[t]he statutory language speaks of '*enforc[ing]*' the 'terms of the plan,' not of *changing* them. . . . [W]e have found nothing suggesting that the provision authorizes a court to alter those terms." *CIGNA Corp. v. Amara*, 563 U.S. 421, 435–36 (2011) (emphasis and brackets by the Court); *see also Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013) ("we have recognized the particular importance of enforcing plan terms as written in § 502(a)(1)(B) claims").[8]

This Court previously held in this case that "[a] plaintiff who brings a claim for benefits under ERISA must identify a specific plan term that confers the benefit in question." (Doc. 46 at 18), quoting *Stewart v. Nat'l Educ. Ass'n*, 404 F. Supp. 2d 122, 130 (D.D.C. 2005), *aff'd*, 471 F.3d 169 (D.C. Cir. 2006) (citing *Clair v. Harris Trust & Sav. Bank*, 190 F.3d 495, 497 (7th Cir. 1999)) (holding that "only benefits specified in the plan can be recovered in a suit under section 502(a)(1)(B)"). Curtis' claim puts the cart before the horse, arguing that Aetna applied an excessively narrow *medical necessity* interpretation that requires reprocessing, but Curtis ignores the fatal weakness in his claim (as the Court found previously), that maintenance PT benefits are

---

[8] Similarly, 29 U.S.C. § 1132(a)(3) "does not . . . authorize appropriate equitable relief *at large*[;]" rather, it "countenances only such relief as will enforce 'the terms of the plan' or the statute" *McCutchen*, 569 U.S. at 100 (emphasis in original; internal quotations omitted); *see also* 29 U.S.C. § 1104(a)(1)(D) (a fiduciary must act "in accordance with the documents and instruments governing the plan").

not *eligible* for coverage, and are otherwise *excluded*, under the Yale Plan.  In short, the Court

need never reach the CPB 325 question because the administrative record reveals <u>no</u> circumstances

under which the Yale Plan provides benefits for maintenance PT.

A recent Eighth Circuit decision confirms that, when a health service is not covered by the

plan, it is irrelevant whether it is medically necessary. In *Shafer v. Zimmerman Transfer, Inc.*, 70

F.4th 471 (8th Cir. 2023), the plaintiff required emergency surgery to remove a bowel obstruction,

but his claim for benefits was denied when it was determined that the bowel obstruction was a

complication of prior bariatric surgery, and the plan expressly provided that "complications of

bariatric surgery are non-covered services." 70 F.4th at 474. Significantly, there was no dispute

that the emergency surgery was "medically necessary." *Id.* at 477 n.5. Nonetheless, the Eighth

Circuit expressly rejected Shafer's argument that the denial "was contrary to the plan's clear

language because the plan covers emergency services without any exclusions and because his

treatment was medically necessary." *Id.* The Court held:  "We disagree because, again, Shafer's

plan excludes coverage for complications resulting from bariatric surgery. That his treatment was

medically necessary does not make it a 'Medically Necessary Covered Expense.'" *Id.* Aetna

determined that Curtis' PT was not covered from May 2018 to April 2019 because he was not

achieving an objective and measurable progression of function, such that his PT was for

maintenance purposes, and/or could have been accomplished with a home exercise program. Curtis

attempts to skirt his inability to show that Aetna's claims determinations were wrong (which he

cannot do) by instead arguing that Aetna should reprocess the same claims because it applied the

"wrong" medical necessity standard in denying Curtis' claims. His challenge fails because his PT

requests were not covered under the Yale Plan as either short-term rehabilitation or habilitation

services.  But, even if they were, Aetna correctly applied to the Yale Plan criteria in denying his PT claims from May 2018 to April 2019.

### 1.     The PT Was Not Covered as Short-Term Rehabilitation

The Yale Plan makes clear that rehabilitative PT is intended to "improve or restore physical functions lost as a result of an acute illness, injury or surgical procedure." (Lynch Decl. Ex. 1, p. 16). There are multiple reasons why Curtis' PT from May 2018 to April 2019 was not short-term rehabilitation covered by the Yale Plan.

*First*, the Yale Plan required that rehabilitative PT be directed at functions lost as a result of *an acute* illness, and expressly excluded coverage for PT "to treat … chronic conditions." (*Id.* at 35). Curtis sought PT benefits from May 2018 to April 2019 purportedly to address physical difficulties flowing from a benign neoplasm of the meninges that originated in 2016. However, even Dr. Schindler recognized in 2018 that Curtis "is beyond the traditional acute and subacute phases of his stroke[.]" (Lynch Decl. Ex. 24 at 2-3).[9] No record evidence supports that his 2016 illness remained "acute" in 2018, when his own doctor said that it did not. Rather, by April 2018, Curtis' reported physical limitations were plainly chronic. *See* Merriam-Webster Online Dictionary (defining "chronic" as "continuing … for a long time."), https://www.merriam-webster.com/dictionary/chronic.

*Second*, the Yale Plan expressly excluded coverage for maintenance PT. Curtis and his doctors repeatedly stated he required PT in order to maintain function. Specifically:

- Dr. Schindler's March 21,  2018 letter asserted that PT was "an indicated long term treatment … ***to maintain his current level of functioning***." (Lynch Decl. Ex. 23 at 1) (emphasis added).

---

[9] Dr. Schindler had previously advised Aetna that Curtis' "most recent" stroke had occurred "in relation to the meningioma resection." (Lynch Decl. Ex. 23 at 1).

- Dr. Schindler's April 11, 2018 notation at the time of a physical exam stated: "The benefit of physical therapy is to promote, *maintain*, and restore physical and physiological well-being of our patient." (Lynch Decl. Ex. 24 at 2) (emphasis added).

- Curtis' November 29, 2018, administrative appeal stated that his doctors wanted him to continue PT "in the hopes of *continuing* to be independent and *to maintain* mobility." (Lynch Decl. Ex. 12 at 1) (emphasis added).

*Third*, the Yale Plan requires rehabilitative PT to be "expected to significantly improve or restore physical functions[.]" (Lynch Decl. Ex. 1, p. 16). Dr. Schindler's November 19, 2018 letter did not opine that more PT for Curtis would lead to significant improvement or restoration of function, and did not provide any contemporaneous medical evidence to support any such conclusion. Rather, Dr. Schindler stated vaguely that Curtis "had not plateaued" in the period preceding April 2018 (which period was not at issue at the time). (Lynch Decl. Ex. 25 at 1). Similarly, Dr. Schindler's March 21, 2018 letter stated the *opposite* of expected "significant improvement": "Physical therapy treatment is an indicated long-term treatment given his recurrent strokes and orthopedic issues to maintain his current level of functioning." (Lynch Decl. Ex. 7 at 1).

Review of the administrative record shows a lack of contemporaneous medical evidence showing actual or expected improvement or restoration of physical function in 2018 from Curtis' 2016 benign neoplasm. The only potentially relevant evidence comes from Dr. Schindler's April 11, 2018 examination, after which he reported that Curtis showed "marked improvement" in muscle strength. (Lynch Decl. Ex. 24 at 2). But that "evidence" does nothing to establish an expectation of continued improvement from May 2018 into 2019.

*Fourth*, the Yale Plan requires that PT be prescribed by a physician and follow a "specific treatment plan." (Lynch Decl. Ex. 1, p. 15). The Administrative Record contains no evidence that Dr. Schindler, or any other doctor, developed or endorsed a specific treatment plan. Dr. Schindler's November 19, 2018 letter to Aetna does not identify or contain evidence of any prescription for

PT. And his vague assertions that PT might "support his recovery goals" and allow Curtis "to work toward a better quality of life" hardly constitute a specific treatment plan. (Lynch Decl. Ex. 25 at 1).

### 2.    The PT Was Not Covered As Habilitation Therapy

Habilitation therapy is intended to "keep, learn, or improve skills and functioning for daily living (e.g. therapy for a child who isn't walking or talking at the expected age.)" (Yale Plan, p. 16). The theory that Curtis' PT from May 2018 to April 2019 was habilitation therapy appeared for the first time in the SAC – *i.e. after* the Court held that his "maintenance PT" was not covered under the Yale Plan as a matter of law. The administrative record is devoid of any evidence that Curtis' doctors prescribed PT for habilitation, and Curtis cannot establish that Aetna applied an unduly narrow test in evaluating a request for habilitation coverage that he never asked Aetna to consider. It is too late for Curtis to argue that Aetna should have considered the coverage provisions regarding habilitation therapy in evaluating his PT claims.

The Administrative Record makes clear that the PT from May 2018 to April 2019 was to treat function that Curtis once had, but allegedly lost due to illness (and therefore was *re*habilitation therapy, not habilitation therapy):

- Dr. Schindler reported in his addendum to the April 11, 2018 treatment note: "Dennis has a complex history that includes musculoskeletal issues with his knees, as well as recurrent strokes that have led him to have impairments in endurance, strength, and coordination. . . . Although Dennis is beyond the traditional acute and subacute phases of his stroke, given that he continues to benefit, it is my medical opinion that physical therapy should continue to be prescribed for Dennis's issues with weakness, endurance, balance, and coordination." (Lynch Decl. Ex. 24 at 2-3).

- Dr. Schindler told Aetna in his March 21, 2018 letter: "Physical therapy has provided benefit for his continued impairments from the recurrent strokes, the most recent in relation to the meningioma resection. Physical therapy treatment is an indicated long-term treatment given his recurrent strokes and orthopedic issues[.]" (Lynch Decl. Ex. 7 at 1).

- Dr. Schindler told Aetna in his November 19, 2018 letter: "Given the complexity of his recent medical and surgical history, he deserves optimal medical and rehabilitative car to support his recovery goals." (Lynch Decl. Ex. 25 at 1).

- Curtis stated in his April 22, 2019 letter that he "is 85 years old. He has had three strokes, a major brain surgery in 2016, and suffers from severe arthritis in both knees. His left knee, injured some twenty years ago in a fall, has gotten worse." (Lynch Decl. Ex. 21 at 1).

There is nothing in the letters submitted by Curtis or any of his doctors asserting that Curtis required PT for habilitation purposes. Moreover, there was not a prescription for habilitation therapy or a treatment plan developed for such therapy.

### 3.    Aetna Properly Applied The Yale Plan In Making Its Adverse Determinations

The Administrative Record establishes beyond question that Aetna administered Curtis' claims for PT services from May 2018 to April 2019 in a manner entirely consistent with the Yale Plan, and that it did not apply any limitation that was not included in the Yale Plan. The conclusions in each of the letters upholding those denials were consistent with definitions, limitations and/or exclusions in the Yale Plan.

Aetna consistently based its claims denials on Curtis' failure to submit medical evidence supporting measurable change in his function as a result of ongoing PT. (*See* Lynch Decl. Ex. 26 at 3, 14 (documentation "did not reveal objective and measurable progression being achieved during the period of denial."); Ex. 27 at 4 ("information … does not show further measurable improvement"); Ex. 15 at 2 (conditions are "neither regressing nor improving"); Ex. 18 at 2 (lack of evidence of "sufficient and significant objective and measurable functional restoration and progression"). Accordingly, Aetna's claim decisions conformed precisely with the Yale Plan:

- The Yale Plan covers PT "only if it is expected to significantly improve or restore physical functions[.]" (Lynch Decl. Ex. 1 at 16).

- The Yale Plan excludes services "that maintain, rather than improve, a level of physical or mental function[.]" (*Id*. at 29).

27

- All health services must be "considered effective for the patient's illness, injury or disease." (*Id.* at 72).

Aetna's letters addressing these denied claims also routinely advised Curtis that PT by a skilled provider was not medically necessary, because a safe transition to a home exercise program could have been implemented. (Lynch Decl. Ex. 14 at 2; Ex. 16 at 2; Ex. 15 at 2; Ex. 13 at 2; Ex. 17 at 2; Ex. 18 at 2). The Yale Plan plainly provides that skilled care is not a covered benefit when similar results can be achieved without the expense of skilled care:

- All health services must be "Clinically appropriate, in terms of type, frequency, extent, site and duration, … [n]ot primarily for the convenience of the patient, physician, or other health care provider[, and] [n]ot more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results[.]" (Yale Plan at 72).

Thus, even if Curtis were achieving some measurable improvement in function from the skilled PT, the Yale Plan provides that it is not covered if "equivalent" results could be achieved with less cost, *i.e.*, through a home exercise program.

Aetna also explained that the Yale Plan "benefits allow short term restorative therapy for non-chronic conditions and acute injuries or illness and do not allow long term rehabilitation for symptom maintenance of chronic conditions." (Lynch Decl. Ex. 15 at 2). The Yale Plan expressly excludes services "that maintain, rather than improve, a level of physical or mental function[,]" and "therapies to treat … chronic conditions." (Lynch Decl. Ex. 1 at 29, 35).

Aetna also followed the Yale Plan when it concluded that Curtis could have safely transitioned to home exercise. The Yale Plan required Aetna to consider whether the requested PT services were "more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results[.]" (Yale Plan at 72).

### B.    Aetna's Consideration of CPB 325 Was Appropriate

Aetna's reference to the CPB 325 language in some of its decision letters provides no justification for claims reprocessing even if that remedy were permissible (which it is not).  First, use of guidelines such as Clinical Policy Bulletins are appropriate under Department of Labor regulations. Specifically, 29 C.F.R. § 2560.503-1(b)(5) requires every employee benefit plan to "establish and maintain reasonable procedures" that *inter alia*, "contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, **the plan provisions have been applied consistently with respect to similarly situated claimants**." *Id.* (emphasis added).

Accordingly, a claims administrator like Aetna, "in determining coverage … must use some criteria [*e.g.* guidelines] in making a reasonable decision[.]" *Weiss v. Banner Health*, 416 F. Supp. 3d 1178, 1187 (D. Colo. 2019) (citing *Summersgill v. E.I. Dupont de Nemours Co.,* 2016 WL 94247, *9 (D. Mass. Jan. 6, 2016); *see also Smith v. Health Services of Coshocton*, 314 F. App'x. 848, 859 (6th Cir. 2009) ("[a] plan administrator can rely on internal rules or policies in construing the terms of an employee benefit plan") (internal citations omitted).

Second, it is perfectly appropriate for a claim administrator to reference clinical guidelines that use different words or more precise standards for specific medical conditions or services under more general plan terms:

> Plaintiff makes only a cursory argument … that the [guidelines] enumerate more requirements than [the standards plaintiff argues should govern], and thus, **per se**, contain more onerous requirements. . . . It is undisputed as a practical matter that the [guidelines] enumerate more specific requirements than those that are found within the definition of 'medically necessary' … But that by definition is often what an interpretation of a plan term does. The mere fact that the [guidelines] have additional criteria does not necessarily mean that [they] are more onerous or restrictive. This is particularly because within the definition of 'medically necessary' the care required must be in accords with 'generally accepted standard of medical care' and 'necessary and appropriate' for treatment of the condition. It is reasonable to understand the

29

> [guidelines] as an interpretation, and a clarification, of what those standards are or
> what care is 'necessary for and appropriate' to treat the condition[.]

*E.R. v. UnitedHealthcare Ins. Co.*, 248 F. Supp. 3d 348, 362 (D. Conn. 2017) (emphasis in

original).

   *Berceanu v. UMR, Inc.*, 2023 WL 1927693, at *13 (W.D. Wisc. Feb. 10, 2023), points out

that, in evaluating clinical guidelines, it is important to recognize they are "ultimately applied by

experts with extensive experience … usually board certified [physicians] – who obviously knew

… what patient-specific factors should be considered." Curtis makes an unsupportable linguistic

argument that a layperson might interpret CPB 325 as imposing a standard that is narrower than

the Yale Plan. It is not. But, in any event, the real issue is whether the administrative record reveals

any evidence that the medical professionals who incorporated CPB 325 into their evaluation of

Curtis' PT claims would necessarily have applied it more narrowly than the coverage afforded by

the Yale Plan. There is no such evidence.

   Third, there is overwhelming case law endorsing Aetna's use of CPBs to assist in making

claim determinations. *See*, *e.g.*, *Quality Infusion Care Inc. v. Aetna Life Ins. Co. Inc.*, 257 F. App'x

735, 736 (5th Cir. 2007) ("Aetna accurately followed its pre-published policy, Aetna Clinical

Policy Bulletin 206 ('CPB 206'), when denying Quality's request that it cover the IVIG services");

*Weiss v. Banner Health*, 416 F. Supp. 3d 1178, 1186 (D. Colo. 2019), *aff'd*, 846 F. App'x 636

(10th Cir. 2021) ("Courts have long recognized that an administrator may establish and rely on

procedures or guidelines so long as they reasonably interpret the plan."); *Sanchez v. ExxonMobil

Med. Plan*, 2022 WL 17814645, at *17 (C.D. Cal. Dec. 5, 2022) ("the record reflects that Aetna

offered a rational reason for denying Plaintiff's claim, namely, failing to produce sufficient

documentation supporting her claim of 'medical necessity' within the meaning of the CPB, despite

Aetna requesting further information several times"); *Lord v. Aetna Life Ins. Co.*, 2014 WL

5307496, at *6 (D. Neb. Oct. 16, 2014) (affirming denial of claim where "the CPB stated that '[i]n summary, the clinical value of X–Stop for patients with [lumbar spinal stenosis] is still uncertain'") (internal quotations omitted); *Specialty Surgery of Middletown v. Aetna*, 2014 WL 2861311, at *7 (D.N.J. June 24, 2014) ("Having considered the language contained in the relevant plans and CPBs, the Court concludes that the administrator's interpretation of that language was reasonable"); *Montvale Surgical Ctr., LLC v. Aetna Ins. Co.*, 2013 WL 2285952, at *5 (D.N.J. May 22, 2013) ("Given Aetna's determination in CPB 0784, Aetna's conclusion regarding Thomas's PRP injections was not arbitrary and capricious as it was supported by substantial evidence."); *Richter v. Aetna Life Ins. Co.*, 2011 WL 13238319, at *2 (W.D. Tex. May 10, 2011) ("Aetna's pre-published coverage criteria found in its Clinical Policy Bulletin Number 0364 ('CPB 0364') [state] that allograft transplants are medically necessary only when certain criteria are met. It is undisputed that the listed clinical criteria were not met in plaintiff's case"); *Ramsteck v. Aetna Life Ins. Co.*, 2009 WL 1796999, at *11 (E.D.N.Y. June 24, 2009) ("despite plaintiff's argument that the procedure in question was 'medically necessary,' as demonstrated by letters in support submitted by her treating physicians, the administrative record conclusively demonstrates that plaintiff did not meet the clinical criteria set forth in the CPB in order for the procedure to be covered as such").

### C. Aetna is Entitled to Summary Judgment on Claims for Reprocessing, Disgorgement, and Injunctive Relief

#### 1. Curtis Cannot Assert A Claim For "Reprocessing"

It is well established that ERISA is a "comprehensive and reticulated statute" with "carefully integrated civil enforcement provision.," *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985). The "carefully integrated civil enforcement provisions found in § 502(a)

of the statute as finally enacted, however, provide strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly." *Id.*

There is no provision in 29 U.S.C. § 1132 affording a plan participant or beneficiary reprocessing relief for a denied claim. Similarly, there is nothing in Section 1132 authorizing a civil action for violating the intangible procedural right to a "fair adjudication" of a claim except to the extent the unfair adjudication led to denial of a claim that should have been approved. Thus, where a claim is not covered under the plan at issue, but a plan participant nonetheless challenges the process the claim fiduciary followed in denying the claim, ERISA provides no relief. *See also Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1622 (2020) ("Winning or losing this suit would not change the plaintiffs' monthly pension benefits. The plaintiffs have no concrete stake in this dispute and therefore lack Article III standing."). Here, Curtis does not seek an award of benefits, but instead – like the hypothetical participant – seeks reprocessing of PT claims for which coverage will **never** exist under the Yale Plan.

The Ninth Circuit recently addressed this precise situation in *Wit v. United Behav. Health*, 58 F.4th 1080 (9th Cir. 2023), holding that ERISA did not authorize a participant or beneficiary to seek reprocessing as a remedy. Reprocessing is not an 1132(a)(1)(B) remedy: "Because the remedy provided under § 1132(a)(1)(B) is to recover benefits or to enforce or clarify rights under the plan, a remand to the administrator for reevaluation is a *means* to the ultimate remedy." *Id.* at 1094 (emphasis by the court). The court explained that a "plaintiff asserting a claim for denial of benefits must therefore show that she may be entitled to a positive benefits determination if outstanding factual determinations were resolved in her favor." *Id. Wit* specifically held that a claim seeking reprocessing instead of seeking payment of the denied benefits is not appropriate relief under ERISA:

> Simply put, reprocessing is not truly the *remedy* that Plaintiffs seek, it is the means to the remedy that they seek. But Plaintiffs expressly disclaimed the actual remedy available to them and narrowed their theory of liability under § 1132(a)(1)(B) in an attempt to satisfy Rule 23's commonality requirement. . . . The district court abused its discretion in accepting the erroneous legal view that reprocessing is itself a remedy under § 1132(a)(1)(B) independent from the express statutory remedies that Congress created, justifying class treatment.

*Id.* at 1095. (emphasis in original).

*Wit* also confirmed that reprocessing is not appropriate equitable relief under 29 U.S.C. § 1132(a)(3). The plaintiffs "expressly disclaimed a remedy under § 1132(a)(1)(B) by declining to show that reprocessing might allow [them] … to recover benefits." *Id.* Having disclaimed a recovery of benefits remedy available to them, they cannot seek what amounts to the same relief under section 1132(a)(3). *Id.* Moreover, section 1132(a)(3) is limited to relief that traditionally was "typically available in equity" before the merger of law and equity. *Cigna Corp. v. Amara*, 563 U.S. 421, 439 (2011), and "Plaintiffs and the district court did not explain or refer to precedent showing how a 'reprocessing' remedy constitutes relief that was typically available in equity." *Wit*, 58 F.4th at 1095. Accordingly, *Wit* concluded: "the district court erred in concluding that 'reprocessing ' was an available remedy under 29 U.S.C. § 1132(a)(3)." *Id.*

*Smith on behalf of Smith v. Health Care Serv. Corp.*, 2021 WL 963814, at *5 (N.D. Ill. Mar. 15, 2021), reached the same conclusion, for the same reason:

> As for the somewhat retrospective forms of equitable relief that Smith seeks—i.e., a declaration that the RTC Guidelines were unlawful as applied to her coverage request and an injunction compelling HCSC to reprocess that request using appropriate guidelines—they fall for another reason. Such relief is typically not available under ERISA where Congress "has 'elsewhere provided adequate relief' for the plaintiff's injury"—namely, an award of benefits due under the plan. *See Mohammed v. Prudential Ins. Co. of Am.*, No. 19 C 3258, 2020 WL 4569696, at *4 (N.D. Ill. Aug. 7, 2020) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996)); *see also O'Shea*, 414 U.S. at 502 (reiterating the bedrock rule that equitable relief is unavailable where remedies at law are adequate). And here, ***it stands to reason that any injury inflicted by HCSC's past denial of benefits for Jane's residential treatment would be adequately remedied by an award of those benefits—a remedy that Smith has expressly disclaimed. . . . The upshot is that Smith may not forgo an award of***

***damages only to seek less adequate forms of equitable relief for HCSC's denial of benefits.*** [emphasis added].[10]

The Second Circuit has repeatedly confirmed that reprocessing is not a remedy in itself; rather, it is an appropriate procedural step in an ERISA benefits recovery action when the Court has determined that the adverse benefit determination was unreasonable or incorrect and that there is some evidence in the administrative record that the claim should be approved, but where the evidence does not compel approval of the claim. In *Miller v. United Welfare Fund*, 72 F.3d 1066, 1073–74 (2d Cir. 1995), the court held;

> Although we find that the Trustees' decision was arbitrary and capricious, we do not conclude that Miller's claim necessarily should have been granted because we do not find that, upon the receipt of additional evidence, a reasonable fiduciary could only have granted the claim. Therefore, we remand to the district court with the instruction that the case be returned to the Fund for reconsideration.

*See also Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 490 (2d Cir. 2013) ("Miles requests an order directing the award of benefits, but we conclude that such relief is unwarranted. Our precedents make clear that even where we conclude a plan administrator's finding was arbitrary and capricious, we will typically not substitute our own judgment, but rather will return the claim

---

[10] In a similar vein, *Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*, 2022 WL 743088, at *10 (D. Conn. Mar. 11, 2022), dismissed an ERISA claim seeking the remedy of a "full and fair review" of denied medical claims because "Plaintiff's claims are adequately addressed under ERISA § 502(a)(1)(B). '[W]here Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief,' *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996), and if the equitable relief a plaintiff seeks 'falls comfortably within the scope of § 502(a)(1)(B), which allows a plan participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan,"' then there is no need to 'allow equitable relief under § 502(a)(3).' *Frommert v. Conkright*, 433 F.3d 254, 270 (2d Cir. 2006)[.]" *See also Biomed Pharmaceuticals, Inc. v. Oxford Health Plans (N.Y.), Inc.*, 775 F. Supp. 2d 730, 738 (S.D.N.Y. 2011) (dismissing claims under ERISA § 502(a)(3) where the 'gravamen' of the challenged claims was that the insurer 'failed to follow proper procedures in denying the Patient's claim for benefits, which resulted in an improper denial of benefits owed to the Patient under the terms of the Plan')."

for reconsideration unless we 'conclude that there is no possible evidence that could support a denial of benefits.'") (quoting *Miller*).[11]

### 2.     Curtis Cannot Assert A Claim For Disgorgement Of Profits

Curtis seeks relief under 29 U.S.C. § 1132(a)(3) "requiring Aetna to disgorge all financial gain realized as a result of Aetna's wrongful conduct in denying Mr. Curtis' … claims for therapy benefits." (SAC at 24). It is well established that section 1132(a)(3) remedies are limited to "those categories of relief that were *typically* available in equity." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (internal quotations omitted) (emphasis in original). "Almost invariably suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for money damages, as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." *Id*. (internal punctuation omitted).

> Although a demand for … disgorgement … is usually characterized as equitable only when the action seeks "to restore to the plaintiff particular funds or property in the defendant's possession," rather than … general profits received pursuant to contract[,] the Supreme Court has carved out from this rule an exception for "profits produced by the defendant's use of [the plaintiff's] property." The demand for the disgorgement of profits of this kind will be characterized as equitable, "even if [the plaintiff] cannot identify a particular *res* containing the profits sought to be recovered."

---

[11] To the extent district courts in the Second Circuit have allowed claims for reprocessing a denied benefits claim, they did not address the question whether the remedy was available under ERISA. *Meidl v. Aetna, Inc.*, 2017 WL 1831916, at *6 (D. Conn. May 4, 2017) (finding that reprocessing is available as "a retrospective injunction") (emphasis by the court). *But see Selby v. Principal Mut. Life Ins. Co.*, 197 F.R.D. 48, 57 (S.D.N.Y. 2000) (finding that a class representative has standing to seek "an injunction requiring that their claims be reprocessed and they seek restitution—that Principal be required to pay all claims that were wrongly denied as a consequence of on-line review.").

*In re Beacon Assocs. Litig.*, 818 F. Supp. 2d 697, 707–08 (S.D.N.Y. 2011) (quoting *Knudson*, 534 U.S. at 214) (citation omitted).

The record is devoid of any facts indicating that Aetna is holding money or property that belongs to Curtis, or that Aetna generated a profit from Curtis' property. Aetna's only role regarding the Yale Plan is to act as third-party administrator, and, as such, Aetna did not hold any of Curtis' money. Lynch Decl. ¶ 4. The Complaint simply alleges a bare entitlement to disgorgement of "all financial benefits [Aetna] has obtained as a result of its [alleged wrongful denial of benefits]." (SAC ¶ 22). Accordingly, even if Curtis had any facts supporting disgorgement from Aetna, that remedy sounds in law, not in equity, and thus is not available under ERISA.

### 3.    Curtis Cannot Assert a Claim For Vague And Overbroad Injunctive Relief

Aetna is entitled to summary judgment with respect to the injunctive relief sought in the SAC because the injunctive relief requested is vague and overbroad. Fed. R. Civ. P. 65(d) requires that "[e]very order granting an injunction . . . must," *inter alia*, "describe in reasonable detail – and not by referring to the complaint or other document – the act or acts restrained or required." Fed. R. Civ. P 65(d), 65(d)(1)(C). This rule requires that "an injunction ... be specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 143 (2d Cir. 2011) (citation omitted). One purpose of this requirement is to "prevent uncertainty and confusion on the part of those to whom the injunction is directed." *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 241 (2d Cir.2001). Thus, the rule is only satisfied when "the enjoined party can ascertain from the four corners of the order precisely what acts are forbidden or required." *Petrello v. White*, 533 F.3d 110, 114 (2d Cir.2008) (internal quotations omitted).

Injunctive relief should be "narrowly tailored to fit specific legal violations," *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 50 (2d Cir.1996). An injunction is overbroad "when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation." *Mickalis*, 645 F.3d at 145. Rule 65(d) applies to both permanent and preliminary injunctions. *Capstone Logistics Holdings, Inc. v. Navarrete*, 838 F. App'x 588, 590 (2d Cir. 2020) (holding that permanent injunction failed to satisfy Rule 65(d)); *Mickalis*, 645 F.3d at 142-46 (same).

First, the SAC's request for injunctive relief is impermissibly vague. Plaintiff seeks an order "permanently enjoining Aetna from conditioning payment of benefits to Mr. Curtis and Class Members for medical services, based on limitations on the determination of whether such services are 'medically necessary' in a manner inconsistent with the Plans' plain language derived from the provisions of Aetna's Clinical Policy Bulletins or other non-plan documents." (SAC, Prayer for Relief ¶ 3; *see also id*. ¶ 6.). This injunctive relief request does not identify what provisions in non-plan documents Aetna may not rely on because they are allegedly inconsistent with Plans. Nor does the requested injunction even identify in what non-plan documents such purportedly inconsistent provisions may be found. *See Squarepoint Ops LLC v. Sesum*, 2020 WL 996760, at *5 (S.D.N.Y. Mar. 2, 2020).

Second, if Curtis is requesting injunctive relief that merely requires Aetna to comply with the terms of the plans it administers, it is impermissibly vague. *See Peregrine Myanmar, Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) ("under Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law").

Third, the injunctive relief requested is overbroad because it extends beyond the conduct alleged in the SAC. The injunctive relief request is not limited to Aetna's use of the one CPB for

which Plaintiff has standing to bring claims (CPB 325). *Mickalis*, 645 F.3d at 145 (holding that injunction violated Rule 65(d) because it prohibited practices that were not subject of the complaint).

## VII.    **CONCLUSION**

The history of this case – dating back to 2019 – is one in which the Court afforded Curtis multiple tries to come up with a claim that could withstand judicial scrutiny. Curtis has failed each time. Examination of the complete record in the summary judgment context demonstrates that the same result is appropriate once again. Aetna is entitled to termination of this lawsuit and the burdens of defending a putative class action.

DEFENDANT
AETNA LIFE INSURANCE COMPANY

By: */s/ Patrick W. Begos*
    Patrick W. Begos (ct19090)
    Theodore J. Tucci (ct05249)
    Kevin P. Daly (ct30380)
    1055 Washington Boulevard
    Stamford, CT 06901
    Tel. No.: (203) 462-7500
    Fax No.: (203) 462-7599
    Email: ttucci@rc.com
           pbegos@rc.com

## **CERTIFICATION**

I hereby certify that on August 15, 2023, the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

BY: *_/s/ Patrick W. Begos_____*